# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMAL BAYDOUN,

      Plaintiff,

v

                         Case No. 2:26-cv-12434

                         Hon.

MERCANTILE BANK,
JOSEPH REDOUTEY, and
MICHAEL BISHOP,

      Defendants.

_____/

| | |
|---|---|
| Jennifer Salvatore (P66640) | Jonathan Kok (P62011) |
| Joan M. Campau (P87538) | WARNER NORCROSS + JUDD, LLP |
| SALVATORE PRESCOTT | *Attorneys for Defendants* |
| PORTER & PORTER, PLLC | 150 Ottawa Avenue NW, Suite 1500 |
| *Attorneys for Plaintiff* | Grand Rapids, MI 49503 |
| 105 East Main Street | T: (616) 752-2487 |
| Northville, MI 48167 | jkok@wnj.com |
| T: (248) 679-8711 | |
| salvatore@sppplaw.com | |
| campau@sppplaw.com | |

_____/

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, JAMAL BAYDOUN, by and through his attorneys,

SALVATORE PRESCOTT PORTER & PORTER, PLLC, and hereby complains of

Defendants MERCANTILE BANK, JOSEPH REDOUTEY, and MICHAEL

BISHOP as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Jamal Baydoun is a resident of Livonia, Michigan in Wayne County, which is within the Eastern District of Michigan.

2.      Mercantile Bank ("Mercantile" or the "Bank") is a subsidiary of Mercantile Bank Corporation, which is a publicly-traded bank holding company with its headquarters in Grand Rapids, Michigan, in Kent County. At all relevant times, Plaintiff was employed by Mercantile and worked out of the Bank's office in Troy, Michigan, which is located within the Eastern District of Michigan.

3.      Joseph Redoutey, upon information and belief, resides in Oakland County, which is within the Eastern District of Michigan.

4.      Michael Bishop, upon information and belief, resides in Kent County.

5.      The alleged violations forming the basis of this action occurred within the Eastern District of Michigan.

6.      Plaintiff brings claims of discrimination based on race, religion, and national origin and retaliation for protected activity under the Elliott-Larsen Civil Rights Act ("ELCRA") and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). He also asserts a claim for wrongful termination in breach of public policy under Michigan common law.

7. On April 3, 2026, Plaintiff filed a complaint with the Equal Employment Opportunity Commission (EEOC); Plaintiff received a right to sue letter on June 25, 2026.

8. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's pendant state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b)(2) as it is the district in which a substantial part of the actionable events and omissions occurred.

## **GENERAL ALLEGATIONS**

10. Plaintiff is Lebanese-American and is Muslim.

11. The oldest of four children in a family of immigrants, Mr. Baydoun worked from a young age to support his family and put himself through school.

12. As a result of his hard work and talent, Mr. Baydoun's career accelerated quickly and he rose rapidly through the ranks of the banking industry, working at JPMorgan Chase and then Bank of America.

13. In 2024, Mercantile began actively recruiting Mr. Baydoun from his position as a Senior Vice President at Bank of America.

14. During the recruitment process, Mr. Baydoun shared with Mercantile's then-Senior Vice President, Defendant Michael Bishop, that his $2 million life

insurance policy through Bank of America was both irreplaceable and highly significant.

15. In 2018, Mr. Baydoun had suffered a massive heart attack. He was in his 40s at the time and few people are known to have survived that particular type of cardiac event.

16. Due to his health history, his life insurance policy had value that could not be replaced.

17. Mr. Bishop and Mercantile's HR representative were aware of this and attempted to provide an enticing enough compensation package that Mr. Baydoun would agree to come on board with Mercantile.

18. Ultimately, Mr. Baydoun gave up this valuable benefit and agreed to join the Bank with the expectation that his employment at Mercantile Bank would be a long-term lucrative arrangement, not a job from which he would be terminated after only 1 ½ years.

19. Mr. Baydoun officially joined Mercantile Bank in September 2024 as a Commercial Banker – First Vice President. Mr. Baydoun understood that part of his role would be to grow Mercantile's business in Wayne County and the eastern side of the state.

20. He performed well in the role, particularly when compared to the other newly-hired bankers.

4

21.     In June of 2025, Defendant Joseph Redoutey joined Mercantile Bank as a "credit partner" and then became Mr. Baydoun's supervisor.

22.     Mr. Redoutey had previously been the Chief Credit Officer at Flagstar Bank and, upon information and belief, he was hired to lead Mercantile Bank's expansion in southeast Michigan.

23.     A few months later, two other employees with numerous client contacts also departed Flagstar and joined Mercantile Bank as Senior Vice Presidents.

***Mr. Baydoun raised concerns about potential unlawful conduct and made clear he would not lie under oath.***

24.     Within a matter of weeks, these two former Flagstar employees had put into Mercantile's pipeline over $100 million of business from current Flagstar clients, despite non-solicitation agreements that each had signed with Flagstar.

25.     Mr. Baydoun expressed concern to Mr. Redoutey about the repercussions for Mercantile Bank once Flagstar learned of this exodus from its portfolio.  He also specifically asked Mr. Redoutey to escalate these concerns to senior leadership.

26.     In fact, the Bank's leadership was already well aware of the risk.

27.     Among other things, Senior Vice President Mike Bishop held a series of meetings during which he coached junior bankers at Mercantile to keep these two former Flagstar employees off of communications regarding the above transactions – actions taken because the Bank was concerned about liability and that the

communications would become discoverable in litigation; Mr. Bishop specifically noted "we don't want that!"

28. Mr. Baydoun was surprised that a Senior Executive would instruct junior bankers in this manner.

29. In or around November-December 2025, Mr. Baydoun informed Mr. Redoutey that if he was ever asked to testify about whether Mr. Bishop had instructed the removal of these two employees from written correspondence, he would testify truthfully.

30. In January of 2026, Mr. Baydoun was approached by third parties and asked about possible violations of the Flagstar non-solicitation agreements by the two recently-departed Flagstar employees.

31. Mr. Baydoun attempted to shut down those conversations, but he again brought the topic up to his manager, informing him that people in the banking community were asking about the issue.

32. Mr. Redoutey's only response was to try to confirm that Mr. Baydoun hadn't divulged anything to these third parties.

### *Mr. Baydoun opposed discriminatory statements regarding Arab- and Muslim-American clients.*

33. On or around January 20, 2026, Mr. Redoutey and Mr. Baydoun met with the borrower and builder on a large commercial project in Dearborn that was being funded by a loan from Mercantile Bank.

34. The borrower and builder, like Plaintiff, are from the Arab-American and Muslim communities.

35. At one point, the group discussed the beautiful private residence that the builder had recently constructed for the borrower.

36. During the meeting, Mr. Baydoun offered to show the home to Mr. Redoutey, who is Caucasian.

37. As the two of them drove through an affluent Dearborn neighborhood, Mr. Redoutey began asking Mr. Baydoun, "how did *these people* get their money"; "how can *these people* afford these types of houses"; and "what the f*** do *these people* do to have these houses"; he also questioned why such wealthy people would "want to live in this neighborhood," seemingly a reference to the neighborhood being an Arab neighborhood.

38. The tone and line of questioning were overtly biased, but Mr. Baydoun treaded lightly, as this was his boss.

39. As they exited the neighborhood, the men passed a particularly lavish home with an American and Lebanese flag out front, as well as a commercial flag for a gas station.

40. Mr. Redoutey was incredulous at the idea that the owner of such a home would be involved in a gas station business.

41.     As Mr. Baydoun drove Mr. Redoutey back to his car, Mr. Redoutey asked whether Mr. Baydoun had cleared with Bank leadership the fact that he was working with clients in Dearborn.

42.     Surprised by the implications of the question, Mr. Baydoun asked what he meant.

43.     To this, Mr. Redoutey replied that banks that he had previously worked for had encountered "problems" in Dearborn.

44.     When Mr. Baydoun repeatedly pressed for a fuller explanation, Mr. Redoutey explained that Mercantile Bank was run by Dutch Reformers who "don't understand what it is like to deal with such clients."

45.     Mr. Baydoun then pushed back, asking, "What's the issue here, Joe, is it because they're Muslim? I'm Muslim, is that a problem?"

46.     Mr. Redoutey then tried to side-step, explaining that at prior banks, the "Jewish banker would serve the Jewish community, and the Indian banker would serve the Indian community" (implying that Mercantile should not be serving the Arab-American community).

47.     Mr. Baydoun then responded, "Well, this is my community."

*Following his protected conduct, Mr. Redoutey and Mr. Bishop retaliated against Plaintiff*

48.     Just two days after these conversations, on or around January 22, 2026, Mr. Bishop sent Mr. Baydoun a meeting invite entitled "Changes Update" for a meeting to be held with Mr. Baydoun, Mr. Bishop, and Mr. Redoutey.

49.     The meeting turned out to be a discussion not of any "changes," but instead of Mr. Baydoun's 2025 performance.

50.     Although Mr. Redoutey had become Mr. Baydoun's supervisor several months prior, Mr. Bishop continued to jointly oversee Mr. Baydoun's work.

51.     The review focused on what Mr. Bishop referred to as "oddities," which were in fact a random assortment of small issues that had arisen months prior, had been addressed in real time, and had not been raised since.

52.     But the message to Mr. Baydoun, just days after Mr. Baydoun had pushed back on his supervisor's discriminatory comments, was that these "oddities" were now a real problem impacting "trust."

53.     Mr. Bishop and Mr. Redoutey also brought up Mr. Baydoun's concerns about the violation of the Flagstar non-solicits.

54.     They quizzed him on who he had discussed the issue with and then admonished him that he should not discuss it further.

55.     Towards the end of the meeting, Mr. Baydoun was informed that he would likely receive a 7 out of 10 on his upcoming annual performance review.

9

56. Just a few days later, Mr. Baydoun was summoned to another meeting with Mr. Bishop and Mr. Redoutey for his performance review. This time, he was told he was receiving a 5.2 (not a 7) and that a performance plan was in order.

57. Mr. Baydoun asked why, if there were so many concerns about his performance, nothing had been said about these issues earlier.

58. Further, knowing that a peer had significantly underperformed (but not received a low score or been put on a performance plan), Mr. Baydoun also asked whether other recently-hired bankers with similar metrics (i.e. the non-Arab, non-Muslim bankers who had *not* raised discrimination concerns or refused to lie under oath and whose production numbers were lower than Plaintiff's) were being given performance plans.

59. Dodging the question, Mr. Bishop then pivoted to different alleged concerns, stated that he did not want the role of babysitting Mr. Baydoun through a performance plan, and terminated him.

60. In fact, Mr. Baydoun was one of multiple bankers in the same role but the only one terminated, despite the fact that several of the other bankers had significantly under-performed Mr. Baydoun.

## COUNT I
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (Michigan Common Law)
### *Against Mercantile Bank*

61.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

62.     Plaintiff, an employee of Mercantile, refused to violate the laws of this state by making clear that he would refuse to testify falsely and refuse to commit perjury in any litigation concerning the non-solicit violations.

63.     Mercantile terminated Plaintiff shortly thereafter because of Plaintiff making clear his intention not to violate the law.

64.     As a direct and proximate result of Defendant's wrongful actions, Plaintiff has sustained economic and non-economic damages including but not limited to the loss of salary and fringe benefits; loss of earning capacity and future earnings and benefits; damage to his professional opportunities and reputation; physical, mental, and emotional distress; embarrassment, anxiety about the future, and humiliation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

11

## COUNT II
## RACE, RELIGION, AND/OR NATIONAL ORIGIN DISCRIMINATION
### (Title VII)
### *Against Mercantile Bank*

65.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

66.     Plaintiff is Lebanese-American and Muslim.

67.     During the course of his employment with Mercantile, Plaintiff was discriminated against with respect to the terms and conditions of employment and was terminated based on his race, religion, and/or national origin.

68.     The discrimination was intentional.

69.     As a direct and proximate result of Defendant's wrongful actions, Plaintiff has sustained economic and non-economic damages including but not limited to the loss of salary and fringe benefits; loss of earning capacity and future earnings and benefits; damage to his professional opportunities and reputation; physical, mental, and emotional distress; embarrassment, anxiety about the future, and humiliation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

## COUNT III
## RACE, RELIGION, AND/OR NATIONAL ORIGIN DISCRIMINATION
## (ELCRA)
### *Against Mercantile Bank and Joseph Redoutey*

70.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

71.     Plaintiff was an employee of Mercantile and was covered by and within the meaning of the Elliott-Larsen Civil Rights Act.

72.     Defendants were his employer within the meaning of the Act.

73.     During the course of his employment, Plaintiff was discriminated against with respect to the terms and conditions of his employment and was terminated based on his race, religion, and/or national origin.

74.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff has sustained economic and non-economic damages including but not limited to the loss of salary and fringe benefits; loss of earning capacity and future earnings and benefits; damage to his professional opportunities and reputation; physical, mental, and emotional distress; embarrassment, anxiety about the future, and humiliation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

13

## COUNT IV
## RETALIATION
### (Title VII)
### *Against Mercantile Bank*

75.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

76.     Plaintiff engaged in protected conduct when he objected to and raised concerns about race, religion, and national origin discrimination directed at him as an employee.

77.     Defendant was aware of Plaintiff's protected conduct.

78.     Defendant took adverse action against Plaintiff because of his protected conduct by, *inter alia*, providing him with an inappropriately and unjustifiably low performance score, threatening him with a performance plan, and then terminating him.

79.     Plaintiff's protected conduct motivated this retaliation by Defendant.

80.     Defendant's retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiff's rights.

81.     As a direct and proximate result of Defendant's wrongful actions, Plaintiff has sustained economic and non-economic damages including but not limited to the loss of salary and fringe benefits; loss of earning capacity and future earnings and benefits; damage to his professional opportunities and reputation; physical, mental, and emotional distress; embarrassment, anxiety about the future,

and humiliation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

**COUNT V**
**RETALIATION**
**(ELCRA)**
***Against All Defendants***

82.     Plaintiff hereby incorporates all preceding paragraphs as if fully restated herein.

83.     Mercantil Bank is both an employer and a place of public accommodation within the meaning of the Elliott-Larsen Civil Rights Act.

84.     Plaintiff engaged in protected conduct when he objected to and raised concerns about race, religion, and national origin discrimination directed at him as an employee and/or directed at Bank customers.

85.     Defendants were aware of Plaintiff's protected conduct.

86.     Defendants took adverse action against Plaintiff because of his protected conduct by, *inter alia*, providing him with an inappropriately and unjustifiably low performance score, threatening him with a performance plan, and then terminating him.

87.     Plaintiff's protected conduct motivated this retaliation by Defendants.

88.     Defendants' retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiff's rights.

89.     As a direct and proximate result of Defendants' wrongful actions, Plaintiff has sustained economic and non-economic damages including but not limited to the loss of salary and fringe benefits; loss of earning capacity and future earnings and benefits; damage to his professional opportunities and reputation; physical, mental, and emotional distress; embarrassment, anxiety about the future, and humiliation; and loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendants and award Plaintiff the following:

a.  Economic and non-economic damages;

b.  Attorney fees and costs;

c.  Punitive damages; and

d.  All other legal and equitable relief determined by the Court to be appropriate.

Respectfully,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

Date: July 16, 2026

/s/ Jennifer B. Salvatore

Jennifer B. Salvatore (P66640)
Joan M. Campau (P87538)
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
campau@spplaw.com

17

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JAMAL BAYDOUN

        Plaintiff,

v

MERCANTILE BANK,
JOSEPH REDOUTEY, and
MICHAEL BISHOP,

        Defendants.

Case No. 2:26-cv-12434

Hon.

_____/

| | |
|---|---|
| Jennifer Salvatore (P66640) | Jonathan Kok (P62011) |
| Joan M. Campau (P87538) | WARNER NORCROSS + JUDD, LLP |
| SALVATORE PRESCOTT | *Attorneys for Defendants* |
| PORTER & PORTER, PLLC | 150 Ottawa Avenue NW, Suite 1500 |
| *Attorneys for Plaintiff* | Grand Rapids, MI 49503 |
| 105 East Main Street | T: (616) 752-2487 |
| Northville, MI 48167 | jkok@wnj.com |
| (248) 679-8711 | |
| salvatore@spplaw.com | |
| campau@spplaw.com | |

_____/

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury in the above-captioned matter.

18

Respectfully,
SALVATORE PRESCOTT
PORTER & PORTER, PLLC

Date: July 16, 2026

/s/ Jennifer B. Salvatore
Jennifer B. Salvatore (P66640)
Joan M. Campau (P87538)
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
campau@spplaw.com